IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT M. FISHMAN,                    )
                                      )
                  Plaintiff,          )
                                      )
     v.                               )      No.  05 C 5227
                                      )
ZURICH AMERICAN INSURANCE COMPANY, )
et al.,                               )
                                      )
                  Defendants.         )

MEMORANDUM OPINION AND ORDER

Robert Fishman ("Fishman") charges Zurich American Insurance
Company ("Zurich") and Zurich North America Supplemental
Executive Retirement Plan ("Plan") with improperly terminating
his Plan benefits in contravention of the Employee Retirement
Income Security Act ("ERISA").  Fishman seeks (1) reinstatement
of his benefits, (2) payment of withheld past benefits and (3) a
civil penalty to be imposed for nonproduction of certain
documents that he requested relating to his denial of benefits.
Counterclaiming for unjust enrichment, Zurich and the Plan
respond that Fishman forfeited his Plan benefits by accepting
employment with a competitor, so that they seek repayment of the
one payment that had been made to Fishman.

All parties now move for summary judgment under Fed. R. Civ.
P. ("Rule") 56.  For the reasons stated in this memorandum
opinion and order, the Zurich-Plan motion for summary judgment is
granted almost in its entirety, while Fishman's motion is granted
to a minor extent.

<u>Summary Judgment Standard</u>

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (<u>id</u>.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

One more complexity is added here, where cross-motions for summary judgment are involved. Those same principles require the adoption of a dual perspective that this Court often refers to as Janus-like: As to each motion the nonmovant's version of any disputed facts must be credited.[1]

---

[1] Each side's Statement of Undisputed Facts will be cited "St. ¶ --," preceded by "F." or "Z." as the case may be. Responses to those statements will be cited "Resp. St. ¶ --," with the same lead-ins (but where the factual assertion in an original statement is unrebutted, only the original will be cited), and Fishman's additional statement will be cited "F. Add. St. ¶ --." As for the parties' memoranda, cited "Mem. --,"

## Background

Zurich employed Fishman from January 1994 through the end of June 2004 (F. St. ¶4). From November 1999 until some time near the end of Fishman's term at Zurich (or perhaps until the end) he held the position of "Vice President – Diversified Products" (F. St. ¶4; Z. Resp. St. ¶4). Fishman became a participant in the Plan on January 1, 2001 (Z. St. ¶2).

Immediately upon departing Zurich, Fishman received one benefit payment of $62,081.67 from the Plan (Z. St. ¶53). Shortly thereafter, however, Zurich learned that Fishman had accepted a position as President of U.S. Insurance at Quanta U.S. Services ("Quanta") and, upon decision of the Administrative Committee, deemed that Fishman had forfeited his Plan benefits through breach of the Plan's non-compete clause (Z. St. ¶¶54-56). Zurich terminated his Plan benefits, and Fishman has received nothing further.

Fishman contends that the Plan is not a so-called "top-hat plan" (more on what constitutes a top-hat plan later), so that it is not exempt from ERISA's vesting provisions and his benefits cannot be forfeited. Alternatively, even if the Plan is a top-hat plan and the forfeiture provision can operate against Fishman, he argues that the Administrative Committee that denied

---

"Resp. Mem. --" and "Reply Mem. --," the respective lead-ins will be "Fishman" and "Z."

his benefits was improperly constituted and lacked the power to make benefit decisions. Fishman further asks for a civil penalty to be levied against Zurich (as the Plan's administrator) because of the nonprovision of requested documents during his appeal of the denial of his benefits. As a counterclaim, Zurich and the Plan charge that Fishman should be made to repay the benefits he already received under the Plan (Z. Motion ¶7).

### Top-Hat Status

As an "employee pension benefit plan" defined by 29 U.S.C. §1002(2),[2] the Plan is subject to ERISA's strictures (F. St. ¶1). Primarily at issue is how much of ERISA applies. If the Plan is a "top-hat plan," as Zurich and the Plan would have it, "it is excepted from ERISA's vesting, participation, funding, and fiduciary rules" (Olander v. Bucyrus-Erie Co., 187 F.3d 599, 604 (7th Cir. 1999)). Fishman urges that the Plan is not a top-hat plan, rendering those sections of ERISA applicable.

If Fishman is right, ERISA's nonforfeitability provision (Section 1053) applies, and Fishman's Plan benefits would have become fully nonforfeitable after either his fifth or seventh year of service (which of those alternatives applies is irrelevant, because Fishman was with Zurich for ten years). Conversely, if the Plan is a top-hat plan ERISA's

---

[2] All further ERISA citations will take the form "Section --," omitting the prefatory "29 U.S.C."

nonforfeitability provision is taken out of play, and the Plan's

forfeiture clause is valid. Plainly there is a great deal at

stake.

To qualify as a top-hat plan, a plan must be "unfunded and

[ ] maintained by an employer primarily for the purpose of

providing deferred compensation for a select group of management

or highly compensated employees" (Section 1051(2)). Any such

plan must be written to conform to, and must actually operate

within, those requirements.[3] And as a general proposition,

ERISA's status as a remedial statute causes its coverage to be

liberally construed, with exemptions confined to their narrow

purpose (<u>Kross v. W. Elec. Co.</u>, 701 F.2d 1238, 1242 (7th Cir.

1983)).

<u>Unfunded</u>

One part of the top-hat definition requires that such a plan

must be unfunded (Section 1051(2)). In his own motion for

---

[3] Fishman Mem. 6-7 invites this Court to interpose a fourth
top-hat requirement: that all Plan members had sufficient
bargaining power to influence the terms of the Plan. That notion
is based on a Department of Labor Opinion Letter recounting that
part of Congress's rationale for the top-hat requirement was that
such high level employees have the ability to affect or
substantially influence the operation of the plan (DOL Op. No.
90-14A). As Judge Selya recently animadverted (to borrow a
Selyaism) on behalf of the First Circuit, the supposed bargaining
power requirement is mentioned nowhere in the statute or the
legislative history, and to convert a legislative rationale set
forth in an agency opinion letter into an independent statutory
test would be "highly unorthodox" (<u>Alexander v. Brigham & Women's
Physicians Org., Inc.</u>, 573 F.3d 37, 48 (1st Cir. 2008)).

summary judgment Fishman has not challenged that element--yet in response to the Zurich-Plan motion for summary judgment Fishman does assert that the Plan is funded (Fishman Resp. Mem. 10). Hence this opinion must examine that issue.

During the lifetime of the Plan at least two outside plans merged into it. When the Maryland Casualty Company Supplemental Executive Retirement Plan ("MCC Plan") was merged with the Plan, Zurich's Board of Directors resolved that "all assets and liabilities of the [MCC] Plan shall be deemed assets and liabilities of the [Zurich] Plan, effective January 1, 2000" (Fishman Resp. Mem. 10; F. St. Ex. 14 at Z22059). Fishman says that shows the MCC Plan was funded and held "plan assets," in turn causing the Plan to be funded because it took on those "plan assets" in the merger (Fishman Resp. Mem. 10).

To be sure, as the nonmovant on that issue Fishman gets the benefit of all reasonable favorable inferences. But for their part Zurich and the Plan contend that such "boilerplate language" in a Board resolution fails to establish the existence of any assets,[4] and the single piece of testimony on the subject is a

---

[4] Language of the nature quoted in the text is a conventional part of all types of merger, and the reference to "liabilities" is of course appropriate whether a plan is funded or unfunded. As for the reference to "assets," however, it may also be observed parenthetically (although that of course is not an element in this Court's decision) that the MCC Plan title ("Supplemental Executive Retirement Plan") has a top-hat ring to it on its own. And if that were so, the word "assets" would simply be the product of careless lawyering. But for the reasons

statement of unawareness of any assets having been transferred

from the MCC Plan to the Plan in the merger (Z. Reply Ex. 10 at

269:17-272:17). Despite the vast amount of discovery over the 2-

1/2 year life of this case (including Fishman's full opportunity

of access to the Plan's financial information), Fishman has not

identified any Plan assets. In those circumstances an inference

from the resolution alone cannot be said to be reasonable, and

Fishman flunks on the "unfunded" component.[5]

Primarily Providing Deferred Compensation

To qualify as a top-hat plan, a plan must also be maintained

primarily for the purpose of providing deferred compensation for

a select group (Section 1051(2)). As the statutory language

itself makes clear, providing deferred compensation need not be

the sole reason for the plan's existence (Garratt v. Knowles, 245

F.3d 941, 946 n.4 (7th Cir. 2001)("the top hat plan can have

multiple broad purposes")). Fishman concedes on that element of

top-hat plan qualification.

---

next set out in the text, speculation along those lines is
needless.

[5] That makes it unnecessary to explore what might have been
a more complex question: Whether the injection of some assets
from the MCC Plan into a previously unfunded Zurich Plan would
have given former Maryland Casualty executive participants an
equitable claim on those assets to the exclusion of Zurich Plan
executives such as Fishman, so that the Plan would remain
unfunded as to the Zurich people.

<u>Select Group of Management or Highly Compensated Employees</u>

It is on the question whether only a select group of management or highly compensated employees was eligible to and did participate in the Plan that the parties butt heads most squarely. Fishman argues that lower level employees were also eligible to and did participate in the Plan, while Zurich and the Plan strongly challenge that assertion.

## 1. Eligibility

In arguing that the Plan limited eligibility to a select group of management or highly compensated employees, Zurich and the Plan stress Plan §10.11:

> This Plan is intended to be an unfunded plan maintained primarily to provide deferred compensation benefits for a select group of "management or highly-compensated employees" within the meaning of Sections 201, 301, and 401 of ERISA.

That provision was part of Plan Art. X, entitled "<u>General Provisions</u>." Indisputably the Plan was created with the <u>intention</u> of operating as a top-hat plan.

Fishman counters with Plan Art. II, dubbed "<u>Eligibility</u>," which deals specifically with eligibility to participate in the Plan. Plan §2.01 (F. St. Ex. 3) states:

> An Employee shall be eligible to participate in this Plan if that individual is:
>
> (a) At least age fifty-five (55) years of age and has ten (10) or more Years of Service; and
>
> (b) The Chief Executive Officer of the Company; or is a direct report to the Chief Executive Officer of the

Company; or is designated in writing as a participant in this Plan by the Chief Executive Officer of the Company and the Executive Vice President of Corporate Development (or succeeding position); or is designated in writing as a participant in this Plan by the Chief Executive Officer of Zurich Home Office and the Chief Executive Officer of the Company; and

(c) Eligible to receive benefits under the Retirement Account Plan of the Employee's Employer at the time of termination of employment.

In interpreting ERISA plans, courts are to "apply general principles of contract law under the federal common law guiding interpretation of ERISA claims" (Ruttenberg v. United States Life Ins. Co., 413 F.3d 652, 659 (7th Cir. 2005)). One such general principle is that a writing (particularly such a detailed and integrated document) is to be construed as a whole, rather than by considering sections in isolation (Restatement (Second) of Contracts ("Rest.") §202(2)). That principle has understandably been applied in interpreting ERISA plans (see, e.g., Kinek v. Paramount Communic'ns, Inc., 22 F.3d 503, 509 (2d Cir. 1994)). Another fundamental principle of contract law calls for such a document to be "interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight" (Rest. §202(1); Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1039 (7th Cir. 1998), applying Illinois common law).

Plan §2.01 cannot fairly be read in a free-standing vacuum--instead it must take its place in the context of its

9

symbiotic relationship with Plan §10.11 and the rest of the Plan. As the overarching purpose provision, Plan §10.11 infuses the top-hat standards for participation into Plan §2.01's eligibility requirements.[6] In light of the Plan's actual operation within those top-hat requirements (discussed in the next section of this opinion), it is clear that non-management and non-highly-compensated employees were never meant to participate in the Plan.

Fishman's arguments rest on two ultimately immaterial points (Fishman Resp. Mem. 4):

   1.  Some people who were potentially eligible for the Plan (but did not participate in it) were neither highly compensated nor management personnel.

   2.  Some participants in the Plan (persons who <u>were</u> highly compensated or management people) weren't eligible under the terms of the Plan.

Fishman's basic problem, though, is that he fails to raise a factual issue about whether any participants in the Plan were not highly compensated or management people.[7]

---

   [6]  This does not of course mean that a naked recital that "This plan is meant to be a top-hat plan" automatically qualifies it as such.  Just as this opinion does with the Zurich Plan, consideration must be given to the integrated whole of the plan (in both form and function).

   [7]  As already stated, to fit the top-hat exemption the Plan must be maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly

Employees who were potentially eligible under Plan §2.01 but did not participate in the Plan do not disqualify it for top-hat status. Fishman thinks otherwise, pointing to "eligible non-participants" who comprise both highly-compensated and non-highly-compensated "direct reports" to the CEO (Fishman Mem. 5, 9; Fishman Resp. Mem. 5-6).[8]

Non-participants who earned many times the compensation of Zurich's mine run employees (e.g., Zurich's Head of Organizational Innovation (Fishman Resp. Mem. 6; Fishman Add. St. ¶25)) pose no threat to top-hat status. Even assuming that those

---

compensated employees" (Section 1051(2)). "Primarily" applies to everything that follows it in that statutory provision--<u>both</u> the provision of deferred compensation and the "select group of management or highly compensated employees." Thus if a very few non-management or non-highly-compensated employees are allowed to participate in a plan, it still qualifies under the statutory definition, for it is still maintained <u>primarily</u> for the designated purpose. As <u>Demery v. Extebank Deferred Compensation Plan (B)</u>, 216 F.3d 283, 289 (2d Cir. 2000) put it succinctly:

> [W]e do not find plaintiffs' focus on the two or three employees who were arguably not "highly compensated" or "a select group of management" to be dispositive.

[8] Fishman also claims that top-hat status is lost because Plan §2.01(b) permits participation in the Plan by those receiving a written designation. Like the firing mechanism on a submarine, the written designation procedure included a safety feature--a two-key system--that restricted any likelihood of nonconforming participants being added to the Plan and torpedoing its top-hat status. Both Zurich's CEO and the Executive Vice President of Corporate Development or the CEO of Zurich's home office had to authorize any such designation. More importantly, both the "primarily" qualifier in the statute and the fact (addressed in the next section) that the actual operation of the Plan rendered Fishman's scenario a purely hypothetical one defeats that argument as well.

people were potential participants because they fit within the category of "direct reports" to the CEO, as Plan §2.01 phrases it, their non-participation in the Plan does not defrock it of top-hat status--it merely demonstrates that some people who might potentially have been eligible to participate were not selected to do so.

Non-highly-compensated and non-management non-participants (e.g., administrative assistants to the CEO) likewise do not destroy top-hat status. It is true that whether the administrative assistants reported directly to the CEO is in factual dispute and that the organizational charts are sufficiently ambiguous to draw reasonable inferences either way (F. St. Ex. 30). But that is really a nonmaterial (that is, non-outcome-determinative) factual issue, for even if those administrative assistants were "direct reports" they were never placed in the Plan because of the purpose stated in Plan §10.11: They were not highly compensated or management personnel. Merely showing that they reported directly to the CEO (if that were indeed the case) does not show that the Plan was not meant for (and confined to) participation by only high-level Zurich employees--indeed, it confirms just the opposite.

Fishman Resp. Mem. 3 also adverts to a few Plan participants--"ineligible participants"--who allegedly did not meet the eligibility requirements of the Plan. That group

comprises (1) an employee who was viewed as ineligible to participate based on his position but was kept in the Plan (Fishman Resp. Mem. 4), (2) a Plan participant who did not participate in the Retirement Account Plan as required by Plan §2.01(c)(Fishman Resp. Mem. 5), (3) a Plan participant who was neither a direct report nor designated to participate as required by Plan §2.01(b) (Fishman Resp. Mem. 5) and (4) four Zurich employees who were allowed to participate in the Plan even after their transfer to Zurich Financial Services in Switzerland (Fishman Mem. 10). Zurich disputes that those employees were ineligible under the Plan, but their eligibility or lack of it is also not material. What Fishman fails to prove (or even generate a reasonable inference regarding) is that any of those assertedly ineligible participants were neither highly compensated nor management people. At best he may contend that some few highly compensated or management employees were placed in the Plan without fitting within the eligibility definition. Such a showing does not deprive the Plan of top-hat status, because their involvement fits the stated purpose of the Plan (and the statute).[9]

Two other plans, the Fidelity and Deposit Company of

---

[9] While a few ineligible Plan participants may be enough to demonstrate noncompliance with the Plan, contrary to Fishman's contention that does not "burst the top hat bubble" because it does not demonstrate noncompliance with the requirement of Section 1051(2)--see n.7.

Maryland Supplemental Retirement Plan and the earlier mentioned
MCC Plan, merged into the Plan.  Although Fishman Mem. 6-7
asserts that those plans allowed non-highly-compensated and non-
management employees to participate and that those participants
then merged into the Plan, he has been unable--despite wide-
ranging discovery--to identify even one such employee.  That
creates no inference at all--let alone a reasonable inference--to
support Fishman's position.

2.  Participation

     Fishman next takes aim at the participants in the Plan,
asserting that they are not all highly compensated because of
significant disparities in their compensation.  But that argument
glosses over (or more precisely, ignores entirely) one key point:
Qualification as a top-hat plan does not require all plan
participants to be highly compensated--instead the plan must be
maintained for a select group that may be made up of management
or highly compensated employees.  Thus proving that any (or all)
of the Plan participants are not highly compensated is not
determinative.  On the other side of the coin, however, a showing
that all of the Plan participants are highly compensated relieves
the need for any showing of their management status.

     High compensation is a relative term.  No universal
watershed exists over which all employees are highly compensated.
To determine whether any specific employee is highly compensated

within a particular corporation, a comparison must be made between that employee's compensation and the average compensation of all corporate employees.  Although neither Fishman nor Zurich and the Plan provide that relevant calculation, this Court has been able to do so from the factual input the parties have provided.

Fishman urges that comparisons should be made among Plan participants and that if some earn several times as much as others, the lesser paid participants are inherently not highly compensated.  That notion is inherently flawed, because--to pick an example--while employee A with a salary of $3 million is clearly more highly compensated than employee B with a salary of $1 million, plainly both are highly compensated in a corporation in which the average employee earns a $50,000 salary.  It is not a question of degree (how highly compensated an employee is), but rather one of status (whether an employee is highly compensated at all).

On the other hand, Zurich and the Plan compare the average compensation of Plan participants as a group to the average compensation of Zurich employees.  That approach has been endorsed by affirmances of District Court opinions in both the First and Second Circuits (Alexander, 513 F.3d at 46; Demery v. Extebank Deferred Compensation Plan (B), 216 F.3d 283, 289 (2d Cir. 2000)).  But on analysis it would seem that a set of

15

comparisons of the average employee's compensation with that of
each Plan participant would far better inform a decision on
whether the Plan satisfies the "primarily" criterion of Section
1051(2). By contrast, a bottom-line comparison of averages with
averages provides less--and less reliable--input. Averages can
be dangerous for more than analytical reasons--recall the old
example of the man who drowned in a "primarily" shallow lake
having an average depth of a foot because he made the mistake of
diving in at a point where it was 12 feet deep.

In complaining that the lowest paid Plan participants did
not sufficiently outearn the average Zurich employee to be
regarded as highly compensated, Fishman Resp. St. ¶32 observes
that in 2001 the lowest two earning Plan participants' average
earnings were $225,000,[10] "only" 3.75 times the average Zurich
employee's compensation of $60,000.[11] Those figures do not help
Fishman's cause--employees earning 3.75 or 4 times more than the
average Zurich employee are "highly compensated" within the
corporation under any reasonable view of that term. And it
should be remembered that if a few of the lowest compensated Plan

---

[10] On Fishman's figures the two lowest salaries of Plan
participants in 2001 were $225,000 and $227,000 (F. St. ¶45), for
an average of $226,000 rather than $225,000. No matter.

[11] Again Fishman's mathematics are suspect: Z. St. Ex. 24
at Z02569-71 shows the average annual compensation for Zurich
employees in 2001 was actually $56,961.40, so that the multiple
becomes almost 4 rather than 3.75.

16

participants were to be viewed as missing the mark (an arguendo premise with which this Court does not agree), the "primarily" standard called for by Section 1051(2) would still be satisfied, and their exclusion would cause an even higher multiple to be generated as to the remaining lowest paid participants.

From 1992 (when the Plan was founded) through 2004 (when Fishman's Plan benefits were denied), the year most favorable to Fishman's unsound position was 1993, when compensation of the least highly paid Plan participant was 2.897 times that of the average Zurich employee[12]--and that low-end figure was truly an

---

[12] With compensation information taken by the parties from W-2 forms (Z. St. Ex. 24 at Z02569-71, Ex. 25 at Z027103; F. St. Ex. 21), the following chart reflects the comparative compensation of the lowest paid Plan participant against the compensation of the average Zurich employee.

| Year | Zurich employee average comp. | Lowest comp. of Plan participant | Multiple |
|------|------|------|------|
| 1992 | 40,548.82 | 165,912.12 | 4.092 |
| 1993 | 43,885.73 | 127,141.58 | 2.897 |
| 1994 | 44,603.55 | 190,081.55 | 4.262 |
| 1995 | 48,557.82 | 206,398.34 | 4.251 |
| 1996 | 50,124.37 | 250,369.04 | 4.995 |
| 1997 | 52,537.44 | 205,759.06 | 3.916 |
| 1998 | 54,750.11 | 256,123.20 | 4.678 |
| 1999 | 52,634.04 | 284,413.84 | 5.404 |
| 2000 | 49,566.08 | 200,000.00* | 4.035 |
| 2001 | 56,961.40 | 224,595.84 | 3.943 |
| 2002 | 60,873.42 | 325,148.97 | 5.341 |
| 2003 | 65,794.36 | 305,863.36 | 4.649 |
| 2004 | 68,027.18 | 277,604.56 | 4.081 |

* For 2000, the figure used for "Lowest comp. of Plan partici-pant" is base salary only, because total compensation was not available for that individual.

17

outlier, as the chart in n.12 shows.  Even that figure, let alone those for all other years, was sufficiently elevated to confirm that each Plan participant was "highly compensated" for purposes of the top-hat exception.  While we are not in the universe of exact science, a level of compensation whose overall range is 4 to 5 times the average has to be viewed as "high" (cf. Demery, 216 F.3d at 289, where the Second Circuit held plan participants highly compensated where their average compensation was "more than double" the average compensation of all employees).

Select Group

Whether the Plan participants were a "select group" within the meaning of the top-hat exemption requires both qualitative and quantitative analysis (Demery, 216 F.3d at 288; Alexander, __ F.3d __, 2008 WL 186385, at *7).  Fishman does not dispute that the number of Plan participants was small relative to the company as a whole:  less than 1% of Zurich's thousands of employees.  Such a limited group is quantitatively select (see Demery, 216 F.3d at 289, finding that a plan covering 15.34% of the entire workforce met the "select group" criterion).

Qualitatively speaking, the Plan included only highly compensated employees (most, if not all, of whom were also upper-level management people).  Fishman's claim that the Plan's eligibility provision also potentially encompassed employees who were neither highly compensated nor management people rests on no

18

foundation in fact.  No evidence even suggests that any such employee (e.g., the CEO's administrative assistants) actually participated in the Plan.  In the face of the utter lack of any such evidence, the Plan must be deemed qualitatively select.

Conclusion as to Top-Hat Status

What has been said to this point has addressed every aspect of the top-hat status of the Plan, and Fishman has come up short across the board.  No issue of material fact has emerged to cast doubt on the outcome.  Because the Plan is unfunded and is primarily maintained to provide deferred compensation for a select group of management or highly compensated employees, it is unquestionably a top-hat plan.

Full and Fair Review

Fishman also advances the fallback argument that his benefits were improperly denied and that he was not granted a full and fair review of the denial.  More specifically, Fishman asserts that the Plan provided that only the Plan Administrator (Zurich) had the authority to decide benefit claims and appeals and that the Administrative Committee that decided his claim and appeal was both improperly constituted and lacked authority to deny his benefits.

Under Plan §9.01 Zurich, as the Plan Administrator (see Plan §1.10), did have absolute authority to determine all questions of eligibility under the Plan--but it was also given the authority

to delegate its duties to others (F. St. Ex. 3).  Hence by proper
designation the Administrative Committee could be authorized to
deny (and to review the appeal of the denial of) Fishman's
benefits.

Zurich's CEO, General Counsel and Chief Development Officer
constituted the Administrative Committee that denied Fishman's
benefits.  Fishman first challenges their decision on two
procedural grounds:  (1) the Administrative Committee had an
insufficient number of members and (2) it was created through an
improper procedure.  Those challenges may be addressed seriatim.

As to the first, the issue is resolved quickly.  Art. V §1
of Zurich's by-laws (F. St. Ex. 16) specifies that the Board can
establish committees that consist of "not less than one-third of
the directors of the Company."  With at least 13 directors
serving on the Zurich Board (F. St. ¶23), the formation of a
three-member Administrative Committee directly contravened that
by-law provision.

But that procedural breach was cured when Zurich's entire
Board acted on December 20, 2004 by executing a Unanimous Written
Consent in Lieu of a Special Meeting of the Board of Directors of
Zurich American Insurance Company ("Unanimous Written Consent,"
reproduced as F. St. Ex. 17) to "ratify and reaffirm the prior
delegation of administrative duties...to an administrative
committee"--and even more importantly (and really conclusively),

by which the entire Board "ratifies and reaffirms the appointment of [the Administrative] Committee" and "<u>ratifies all actions taken by the Committee</u> to date within the scope of the administrative authority of the Company with respect to the administration of any of the Non-Qualified Plans"--which latter term expressly includes the Plan (F. St. ¶24). Although Fishman complains that no advance written notice was given, as the by-laws require in the case of any Board special meeting (F. St. ¶22), that is truly a red herring.

It must be remembered that such issues are matters of internal corporate governance--for example, advance notice of special meetings is required to assure that no Board action can be taken without <u>every</u> Board member being aware of the possibility of such action and having the opportunity to provide his or her input before the Board acts. Where (as took place here) all of the Board members joined in the execution of the Unanimous Written Consent, no separate "notice" was required. Such unanimous action in lieu of a meeting is specifically authorized by Section 708(b) of the New York General Business Corporation Law (Zurich is a New York corporation) and, indeed, by a provision of Zurich's by-laws (Art. X, §5) that Fishman does not mention (though in that respect the governing statute would control in any event).

That ratification and reaffirmation of the Administrative

Committee's actions also overrode any flaw in the constitution of that Committee. After all, any delegation by a Board of Directors is intended to enable fewer than all of its members to take action that would otherwise require participation of the entire Board. And when the entire Board signs on after the fact to some action that has been taken by fewer than all of its members, that ratification operates in just the same way as if the entire Board rather than a committee had taken the action in the first place.

Hence Fishman's procedural challenges to the Administrative Committee's decisions fail. And Fishman's remaining complaints, dealt with in the balance of this opinion, do not at all taint the substance of those decisions.

<u>Nonproduction of Documents</u>

Among Fishman's grievances vented in this action is his complaint that Zurich, as the Plan administrator, violated ERISA by failing to provide him with certain requested documents. In its motion for summary judgment Zurich contends that all documents necessary for statutory compliance were provided in the correct time frame. At issue are the request and provision of (1) a summary plan description, (2) a summary (or summaries) of material modifications and (3) all "relevant" information pertaining to the denial of Fishman's benefits (Fishman Resp. Mem. 11).

<u>Summary Plan Description</u>

Fishman complains that the Supplemental Executive Retirement Plan Summary Description ("Plan Summary") provided to him was deficient as a summary plan description because it lacked (1) an explanation of claims procedure, (2) an ERISA rights statement, (3) a designation of a Plan administrator and (4) a disclosure of agent for service of process (Fishman Resp. Mem. 15). All of those items are required to be contained in a summary plan description by statute (Section 1022(b)) or regulation (29 C.F.R. §2510.102-3 ¶¶(s), (t), (f) and (g)), or by both.

In responding to the allegations, Zurich and the Plan make no claim that any of those four items are contained in the Plan Summary. Rather they contend (1) that despite the absence of those items the Plan Summary still constituted a summary plan description as required by ERISA and (2) that this Court should weigh the appropriate factors and exercise its discretion to forgo awarding a civil penalty (Z. Reply Mem. 13).

That first argument one leads nowhere. What was provided to Fishman was not a fully adequate summary plan description if it omitted those four items, and Zurich does not contest the omissions. As for the second argument, Zurich and the Plan do not truly seek summary judgment in the conventional sense, but rather ask that no civil penalty be imposed for the error. Although that notion of treating the statutory violation as

without consequence is unpersuasive, the situation is one in which there is no genuine issue of fact as to the violation--and hence this Court will determine the appropriate sanction as a legal matter.

To that end <u>Winchester v. Pension Comm. of Michael Reese Health Plan, Inc. Pension Plan</u>, 942 F.2d 1190, 1193 (7th Cir. 1991) teaches that "the purpose of §1132(c) is not so much to penalize as to induce plan administrators to respond in a timely manner to a participant's request for information." Hence the statute dictates imposition of a penalty on a day-by-day basis (up to a maximum of $110 per day[13]).

Because no proof of harm is required under Section 1132(c), <u>Ziaee v. Vest</u>, 916 F.2d 1204, 1210 (7th Cir. 1990) calls for focusing on the plan administrator's conduct rather than on injury to the plan participant. Here Fishman made two requests specifically asking for a summary plan description, first on April 12, 2005 and then again on July 1, 2005--requests that Section 1132(c)(1) calls for answering within 30 days (by May 12 and July 31, 2005, respectively)(F. St. ¶4). Fishman does not contend that Zurich's production of the Plan Summary was not

---

[13] Although Section 1132(c)(1) originally placed the ceiling at $100 per day, that has been adjusted upward for inflation to $110 by Department of Labor rulemaking (under the authority of the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996)(68 FR 2875-02, Tbl. 1).

timely, but rather that it was incomplete so as not to qualify as the summary plan description prescribed in the statute and regulation.

But any decision as to the appropriate sanction must take account of the fact that the Plan Summary <u>did</u> summarize most of the relevant provisions of the Plan:  It briefly laid out the Plan's eligibility requirements, how Plan benefits are calculated, how a Plan participant should go about terminating employment, forfeiture of Plan benefits (because of misconduct or securing employment with a competitor), the time and manner of benefit payments, the taxation of Plan benefits, the supplemental death benefits and "general provisions" stating that the Plan was unfunded and could be modified or terminated by Zurich at any time (Z. St. Ex. 29 at Z00038-40).  Thus in comparative terms the omitted information required by ERISA--the identities of the plan administrator and an agent to receive service of process, the procedure for claims and the ERISA rights statement--though significant, did not bulk large.

That being so, what is called for by way of a penalty should clearly be modest in relation to the statutory maximum.  Such a resolution does not belittle the importance of the omitted provisions, but rather recognizes that the plan administrator is

not in need of a stiff penalty to induce compliance.[14]

Under all the circumstances, this Court holds that a civil penalty equal to 10% of the statutory maximum--$11 per day--is ample to fulfil the purpose of Section 1132(c). All the days from May 12, 2005 (the date that Zurich was required to respond to Fishman's first request) to the present will be counted in calculating the price to be paid for the four omissions in the summary plan description. Zurich is therefore ordered to pay a civil penalty of $11,396 to Fishman for the 1036-day tardiness in supplying a conforming summary plan description.

Summaries of Material Modifications

Although Complaint ¶¶34-35 assert that Zurich failed to provide Fishman with summaries of any material modifications to the Plan, and although he mentions the duty to do so in his Resp. Mem. 11, he has failed to make any factual or legal argument at all on that issue. Such a nonresponse to an argument in an opposing party's brief leads to forfeiture of the issue (Palmer v. Marion County, 327 F.3d 588, 597-98 (7th Cir. 2003)). With no identification of what Fishman believes should have been produced, that aspect of his contentions falls away.

---

[14] Zurich and the Plan suggest that the omissions would have been readily curable if Fishman had identified the now-complained-of omissions. True enough, but the law imposes the disclosure obligation on the plan administrator, and this Court will do the same. At the same time, it would be troublesome to think that Fishman might have been sandbagging Zurich and the Plan in the hope of maximizing a possible recovery.

<u>All "Relevant" Information</u>

Fishman also complains that, although requested, he was not furnished with copies of "all documents, records, and other information relevant to [his] claim for benefits" as required by regulation (29 C.F.R. §2560.503-1(h)(2)(iii)). In his response to the Rule 56 motion, Fishman identifies six allegedly relevant documents that were not timely produced: two memoranda generated by Zurich-Plan's counsel Willkie Farr & Gallagher LLP ("Willkie Memoranda"), agreements between Zurich and Antonia Porterfield ("Porterfield Agreement") and John McCartney ("McCartney Agreement"), the Zurich by-laws and the November 27, 2000 Report on Examination of the Zurich American Insurance Company by the New York Insurance Department ("New York Insurance Department Report").

Information is deemed "relevant" to a claim if it (29 C.F.R. §2560.503-1(m)(8)):

   (i) Was relied upon in making the benefit
   determination;

   (ii) Was submitted, considered, or generated in the
   course of making the benefit determination, without
   regard to whether such document, record, or other
   information was relied upon in making the benefit
   determination;

   (iii) Demonstrates compliance with the administrative
   processes and safeguards required pursuant to paragraph
   (b)(5) of this section in making the benefit
   determination; or

   (iv) In the case of a group health plan or a plan
   providing disability benefits, constitutes a statement

of policy or guidance with respect to the plan
concerning the denied treatment option or benefit for
the claimant's diagnosis, without regard to whether
such advice or statement was relied upon in making the
benefit determination.

Paragraph (b)(5) requires that administrative processes and

safeguards be designed to ensure that benefit claims

determinations are made in accordance with the governing plan

documents and similarly situated claimants are treated

consistently.

Both Willkie Memoranda were generated in 2005 (one in

January and the other in July).  With Fishman's benefits having

been denied in July 2004, neither of those documents could have

been relied upon or considered in making the benefit

determination.  Moreover, even if the memoranda could nonetheless

have been deemed "relevant" (a highly doubtful premise), Zurich

invokes the attorney-client privilege.  For more than one reason,

then, Fishman loses that argument.

As for the Porterfield Agreement (F. St. Ex. 42) and the

McCartney Agreement (Z. Resp. St. Ex. 9), each of those departing

employees agreed, among other things, not to accept employment at

any of 17 named "major competitors" for two years in return for a

payment.  Both agreements explicitly say that the covenant in no

way affects benefits arising under the Plan.

Fishman contends that the "major competitors" limitation is

meaningless because Porterfield and McCartney were already

"forbidden" to work for those companies under the Plan. Not so. Employment with a competitor is not literally "forbidden" by the Plan--instead the Plan attaches a price to such employment by providing that accepting employment with a Zurich competitor will result in a forfeiture of benefits. Plan participants are free to work wherever they please, but it costs them.

What the Porterfield and McCartney Agreements reflect are simply negotiated deals that Zurich and the employees were free to make. Neither agreement defines the term "competitor" for purposes of the Plan's forfeiture provision, and both are thus irrelevant to Fishman's benefit determination under the Plan.

Finally, as to the Zurich by-laws and the New York Insurance Department Report, Fishman asserts that those documents show the Administrative Committee that denied Fishman's benefits was improperly constituted and therefore lacked power. But those documents are not "relevant" in the regulatory sense: They were not used in any way in considering Fishman's claim for benefits.

In summary, Zurich's withholding of the six identified documents was not improper. It did not violate its obligation to produce all information relevant to Fishman's denial of benefits.

Unjust Enrichment Counterclaim

Zurich and the Plan also seek summary judgment on their counterclaim for unjust enrichment (Z. Motion ¶7). Fishman received $62,081.67 as his first payment under the Plan on

29

July 1, 2004, and repayment of that amount is sought because of
Fishman's breach of the Plan's forfeiture provision, Plan §5.03:

> The benefit payable under the Plan will be forfeited in
> the event an Employee obtains employment with, or
> performs services of any kind for, a competitor of the
> Company or a Related Employer within two (2) years of
> termination of service with the Company or the
> Participant's employer, unless express written consent
> is given by the Chief Executive Officer of the
> Company....A competitor is an organization in the
> business of insurance, reinsurance, financial services,
> or any other activity conducted by Zurich or a Related
> Employer.  A competitor is also deemed to include any
> business which solicits or services any account
> serviced by Zurich or a Related Employer at any time
> during the Participant's employment with the Company or
> a Related Employer.

There is no question that Fishman became the President of U.S.

Insurance at Quanta in July 2004--less than a month after

receiving the $62,000-odd payment and also less than a month

after he left Zurich (obviously well within the two-year period

proscribed by Plan §5.03).  There is likewise no question that

his new position was in "an organization in the business of

insurance" and hence was employment with a "competitor" within

that section's definition.[15]

Forfeiture of "[t]he benefit payable under the Plan"

literally means surrender of the entire benefit, not only the

portion of the benefit that is yet to be paid at the time the

---

[15]  Although Fishman has included within his Motion for
Summary Judgment ¶10 a conclusory statement that he "disputes
that he violated the noncompetition [sic] term," he nowhere
quarrels with the fact of his new employment--something that was
publicized in a Quanta press release at the time.

employee decides to flout the provisions of Plan §5.03. It takes only a little thought to see why those provisions should be read in that literal sense, rather than in some other fashion. Any such strained reading, which would allow Fishman to keep any already-received distribution, would encourage unwholesome conduct in each direction: On the one hand, the Plan would be prompted to delay payments as much as possible in an effort to maximize the force of the restrictive covenant,[16] while on the other hand a departing employee such as Fishman would exercise every effort to accelerate payments and, indeed, to time any disclosure of joining a competitor so as to maximize the receipt of nonrefundable benefits.

To receive his benefit, the only price that Fishman had to pay was not working for a competitor of Zurich for two years. It was not a rolling arrangement that would enable him to receive (say) one year's benefits in exchange for forbearing employment with a competitor for that one year.

It is obviously during the time that most closely followed Fishman's separation from his employment with Zurich that it had the greatest interest in his not transporting his knowhow to a

---

[16] It is worth noting that Zurich, before the parties had their falling out, made the initial benefit payment on the very next day after Fishman's departure. Would it have done so if any already-made payment was not subject to recapture once Fishman triggered the generation of Plan §5.03? That question really answers itself.

new insurance company.  That type of problem tends to attenuate over time, and that is plainly why Zurich required him to refrain from employment with a competitor for two years (a period that restrictive covenant jurisprudence regularly holds to be reasonable) or else to lose his benefits.  Because his employment with Quanta has been found to violate his covenant not to compete, Fishman must pay the money back.  Summary judgment in the amount of $62,081.67 in Zurich's favor is granted.

## Conclusion

Fishman's contentions that the Plan is not a top-hat plan and that the denial (and the review of the denial) of his benefits was procedurally improper are unavailing.  There is no genuine issue of material fact in those respects, and summary judgment is granted in favor of Zurich and the Plan on Fishman's claim for Plan benefits, as well as on their related counterclaim for the repayment of the $62,081.67 in benefits already received by Fishman.

Zurich's unquestioned nonproduction of some components of a conforming summary plan description triggers this Court's grant of summary judgment in Fishman's favor on that score, causing the imposition of a $11,396 civil penalty that shall be set off against the $62,081.67 recovery on Zurich's counterclaim.  But with that as an exception, summary judgment is granted in Zurich's favor as to any claimed nonproduction of any other

documents.

_____
Milton I. Shadur
Senior United States District Judge

Date:  March 13, 2008